[No. 13207.  Department One.  March 24, 1916.]

GEORGE L. OSBORNE *et al.*, *Appellants*, v. PHOENIX INSURANCE COMPANY OF HARTFORD, CONNECTICUT, *Respondent*.[1]

INSURANCE—FIRE INSURANCE — ISURABLE INTEREST — VENDEE'S LIA-BILITY TO CREDITORS—SALES IN BULK.  Where a stock of goods worth $2,600, insured for $2,000, was sold and transferred for $300, with the accompanying affidavit required by the sales-in-bulk law (Rem. & Bal. Code, §§ 5296, 5297) showing creditors whose goods to the amount of $2,300, had not been paid for, the purchaser assumed the liabilities to the extent of the value of the goods, and hence had an insurable interest therein and could collect the insurance; notwith-standing an agreement between the parties to the sale that the goods unpaid for were to be returned to the creditors, since the creditors had not consented to that arrangement and were entitled to be paid in cash (MORRIS, C. J., dissenting).

TRIAL—ISSUES—DIRECTION OF VERDICT.  In an action on an in-surance policy in which plaintiff's valuation of the goods was de-nied by the defendant, but defendant failed to put in any proof upon the announcement of a directed verdict for plaintiff in a re-duced sum, the court would not be justified in directing a verdict for the face of the policy, as defendant was entitled to try out the issue.

Appeal by plaintiffs from a judgment of the superior court for King county, Ronald, J., entered November 16, 1915, upon the verdict of a jury favorable to the defendants, by direction of the court, in an action on a policy of fire in-surance.   Reversed.

*Myers & Johnstone*, for appellants.

*Halverstadt & Clarke*, for respondent.

[1] Reported in 156 Pac. 5.

MOUNT, J.—This action was brought upon a fire insurance policy, to recover for the value of goods insured and lost by fire. The face value of the policy was $2,000. The answer admitted the policy and that proofs of loss were furnished thereunder, but denied that the goods were of the value alleged. For an affirmative defense, it was alleged that the assured was not the owner of the goods, but held a chattel mortgage thereon for $300; and that the assured falsely represented to the insurance company that he was the owner of the property. For a further answer, the defendant alleged that, under the terms of the policy, it became void if the interest of the assured was other than unconditional and sole ownership; and that the assured, at the time of the fire, was not the unconditional owner of the property. Upon these issues, the case was tried to the court and a jury.

At the close of the plaintiff's evidence, the defendant moved for a dismissal, for the reason that the evidence showed that the plaintiffs' sole interest was that of chattel mortgagee. The trial court denied this motion, but stated, in substance, that it would instruct the jury to return a verdict in favor of the plaintiffs for $300, by reason of the fact that no title to the goods which had been placed in the stock by creditors passed by the bill of sale to the plaintiff Osborne. The defendant, after the court had made this ruling, announced that it was satisfied therewith, and rested. The plaintiffs thereupon moved for an instructed verdict for $2,000, the face of the policy, which motion the court denied. The jury, upon instruction by the court, returned a verdict in favor of the plaintiffs for $300. The plaintiffs have appealed from the judgment entered upon the verdict.

It appears that, on April 25, 1915, one George W. Pate was conducting a grocery store and meat market in Seattle. On that date he procured from the defendant a policy of insurance for $2,000 upon his stock of goods and fixtures. On May 20, 1915, Mr. Pate sold this stock of goods and fixtures to Mr. Osborne, by bill of sale, for an express consid-

eration of $300.   At the time of this sale, Mr. Pate made and delivered to the purchaser a list of creditors, with their residences, and the amount due each creditor.   On the date of this sale, Mr. Pate assigned the policy of insurance to Mr. Osborne; and upon the same date, the insurance company consented in writing to such assignment.   On that night, the place and all the goods therein were entirely destroyed by fire.   Thereafter proofs of loss were made; and the insurance company refused to pay, for the reason that Osborne was not the owner of the goods; that his only interest therein was that of a mortgagee for the sum of $300.

At the trial of the case, Mr. Pate testified as follows:

"Our understanding was that I transfer the stock and goods, wares and merchandise, all the fixtures and stock to Mr. Osborne with the understanding that we return to the creditors the goods that belonged to them, the same as we did Sylvester."

It appears that, prior to the sale, Sylvester Brothers, who were creditors of Mr. Pate, had taken away from the store goods which they had sold to Mr. Pate.   Thereupon, in answer to questions propounded by the court, the witness testified as follows:

"Q. (By the Court).  I take it you mean the goods that each creditor had put in there?  A. Yes, sir.  Q. You could identify them?  A. Yes, sir; we could each and every article. Q. Did you fix the amount of goods which the creditors were to take out of that store in amount?  A. I don't know each separate amount, but it could be segregated from the invoices.  Q. Can you tell me approximately the amount that they were to take out?  A. No, sir; I don't believe I could. . . .  Q. Could you take your invoice, plaintiff's exhibit C., and tell me the value of the goods which you expected to take out of the store and return to the creditors?  A. This invoice here includes all of the grocery and meat fixtures together, and the goods to be returned were principally groceries and grocery fixtures.  Q. Can you tell what amount of goods were to be returned to the creditors out of the stock of goods in value?  A. The invoice shows about $2,300 and

something. Q. Do you mean the $2,300 was to all go back to the creditors? A. Nearly all of it; yes, sir. Q. And Mr. Osborne would have what remained in the store after the $2,300 went out? A. He would have the location and the store as it stood after the goods were out. Q. Then practically all the stock was to go out and Mr. Osborne would retain the store and the location? A. Yes, sir. Q. As I understand, for my own guidance here, after Sylvester Brothers took their goods out, there was about $2,300 worth of goods left in there? A. Yes, sir. Q. That you had bought from other creditors? A. Yes, sir. Q. And not paid for? A. Not paid for all of them; no, sir. Q. Those goods that were not paid for were to be returned to the vendors? That is correct? A. Yes, sir. Q. And the only goods that you sold were such goods as you had paid for? A. Yes, sir. Q. You didn't sell, and didn't intend to sell, any goods that were in that store that had been placed there by some other creditors and which you had not yet paid for? A. I mentioned some of these in the bill of sale, that it was the understanding that they were to be sent back."

Mr. Osborne, who purchased the store, testified as follows:

"Q. You understood that all of the goods which Mr. Pate had purchased which were not paid for were to go back to the creditors? A. Yes, sir. Q. And you didn't understand that this bill of sale covered any of those goods? A. Yes, sir; I had the bill of sale to hold him, with the understanding that they go back to the creditors. I was held responsible for them. Q. You didn't understand they were your goods? A. They were mine until they were turned; yes, sir; because the bill of sale covered them. Q. You knew that Sylvester had already taken his? A. I knew he got part of it; yes, sir. Q. And you knew the rest of these people would come up and get them and take them out? A. Mr. Pate said they would, and I supposed they would. Q. You didn't expect, when these people came up and asked for their goods, you didn't expect to refuse them? A. No, sir. Q. To claim them? A. No, sir. Q. You expected to let them take them out? A. Certainly; yes, sir."

The witness also testified that the value of the goods paid for that were not to be returned was a good $300.

We are satisfied that, under this evidence, the trial court erred in instructing the jury to return a verdict for $300. The bill of sale from Mr. Pate to Mr. Osborne was, upon its face, an absolute transfer of all the property to Mr. Osborne. It was either what it purported to be, or it was a security merely for the amount that was owing Mr. Osborne. If it was what it purported upon its face to be, a sale of the whole stock of goods to Mr. Osborne, then the insurance company was liable for the value of the goods lost.

It is argued by the respondent that the evidence which we have heretofore quoted shows that the only interest which Mr. Osborne had in the goods was $300, which he paid therefor, and that he acquired no title to the goods in the stock which were to be returned to the creditors. It is also argued that the policy of insurance is an indemnity to the individual; and that, inasmuch as the interest of Mr. Osborne in the goods was $300, the insurance company was liable only for that amount.

It is no doubt correct, as argued by the respondent, that the contract of insurance is a contract of indemnity; and if the evidence in this case shows that Mr. Osborne, when he purchased the stock, obtained only a $300 interest therein, the respondent's position would be correct. But we think the evidence quoted fairly shows that the whole interest of Mr. Pate in the store and stock of goods was transferred by the bill of sale to Mr. Osborne. Mr. Osborne thereupon took possession of the stock of goods and the store, and immediately became liable to the creditors, the same as Mr. Pate was before the transfer. A fair construction of the evidence above quoted is that there was an understanding between Mr. Pate and Mr. Osborne that the creditors would be permitted to take their goods out of the store in payment of their claims. But there is no showing in the record that the creditors had agreed to this. So far as the record shows, the creditors knew nothing of this transfer from Mr. Pate to

Mr. Osborne, or of the agreement between them. Mr. Osborne was aware of the fact that Mr. Pate was owing a large amount upon the goods, because an affidavit accompanied the bill of sale showing the different creditors, and the amount due each. Without this affidavit, the sale, under the sales-in-bulk law, Rem. & Bal. Code, §§ 5296, 5297 (P. C. 203 §§ 9, 11), would be void and of no effect as to the creditors. Clearly the object of these sections of the sales-in-bulk law was to protect creditors in case of a sale of goods in bulk.

Mr. Osborne, when he purchased the stock and took possession of it, necessarily assumed the liabilities to the extent of the value of the goods, even though there was no express agreement between him and his vendor to that effect. If the vendor, Mr. Pate, and the vendee, Mr. Osborne, did agree that certain goods should be taken out of the stock and delivered to the creditors, that agreement was not binding upon the creditors. They were entitled to have their claims paid either in cash or goods as they saw fit. And when Mr. Osborne took the goods under those conditions, he became liable for the goods in his possession. He therefore had an insurable interest. They were, as between him and the insurance company, his goods. If they were destroyed or taken away while in his possession, the loss was his loss, and he was liable to pay the claims of the creditors. So it seems clear to us that Mr. Osborne had an insurable interest in the goods at the time the policy of insurance was transferred to him. The court, therefore, erred in directing a verdict for $300 in favor of the plaintiffs.

We are also satisfied that the trial court would not have been justified, under the circumstances, in directing a verdict for the face of the policy, because the value of the goods, as alleged in the complaint, was denied by the defendant. It had a right to have the jury determine the value of the goods upon evidence which it was authorized to introduce

under its answer.  When the court announced that it would instruct the jury to return a verdict in favor of the plaintiffs for $300, the defendant was satisfied with that instruction, and, for that reason alone, rested its case without introducing any evidence.  We think the trial court should have permitted the defenses to be shown, and submitted the case to the jury upon the issues presented upon all the evidence.

The judgment is therefore reversed, and the cause remanded for further proceedings.

CHADWICK, FULLERTON, and ELLIS, JJ., concur.

MORRIS, C. J. (dissenting)—A fire insurance policy, like any other contract, is to be construed according to its terms. In this instance it protected Osborne against the loss sustained by him.  That loss was only $300.  I cannot accept as law a rule that construes the policy as a contract to pay for the goods lost, irrespective of the loss sustained by the insured.  The latter and not the former is the rule.  I therefore dissent.